

**IN THE UNITED STATES COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GORDON ROY PARKER,** 4247 Locust Street, #119 Philadelphia, PA 19104 (267) 298-1257 SnodgrassPublish@aol.com,                    Plaintiff, <br><br> v. <br><br> **SOCIAL SECURITY ADMINISTRATION,** 43rd and Chestnut, Philadelphia, PA 19104, and <br><br> **PENSION BENEFIT GUARANTY CORPORATION,** 2500 Grubb Road, #21, Wilmington, DE 19810, <br><br>                  Defendants | : : : : : : : : : : : : : : : : : | **Case No:** **15   3453** <br><br> **Complaint To "End Social Security As We Know It." (constitutional challenge Rule 5.1)** |

**COMPLAINT FOR VIOLATIONS OF THE REHABILITATION ACT OF 1973**

Plaintiff **Gordon Roy Parker** sets forth the following:

**THE CAST**

1.    Plaintiff is Gordon Roy Parker.  He has been on SSDI since 2014, having been awarded his back benefits in April, 2015.  His monthly benefit is $867.00 a month, from which his "mandatory" participation in Medicare will siphon approximately $138.00 a month, leaving him with $729.00 a month on which to survive.

2.    Defendants are the Social Security Administration ("SSA") and the Pension Benefit Guaranty Corporation ("PGBC").

**THE PLOT**

3.    This is a federal lawsuit, an *as-applied* challenge to the benefits-calculation formula for retirees, those on SSI, and those receiving pensions insured by PGBC with Plaintiff's hard-earned tax *dollar* [sic] (approximately his yearly federal tax liability these days).

1

4.   According to Defendant SSA's own *Social Security History* website, President Roosevelt made clear that benefits had to be *earned!*   Check it out:



how the courts would see this new function of government, the framers of the AAA deliberately placed the tax provisions and the subsidy provisions in separate titles of the act, so they could argue that they were not necessarily connected to each other; that is, so they could argue that the purpose of the tax was not to control production but was merely to raise revenue. This was the same strategy adopted by the framers of the Social Security Act, as can be seen in the separate Titles II and VIII of the original Social Security Act.

The old-age insurance system introduced in the Social Security Act was designed, at a public policy level, to be a contributory social insurance program in which contributions were made by workers to what was called the "old age reserve account," with the clear idea that this account would then be the source of monies to fund the workers' retirement. Actuarial studies were done to determine what the contribution rate would need to be in order to have sufficient reserves in the account to pay anticipated benefits. In the popular understanding of the program, the contributions established an "earned right" to the eventual benefits. President Roosevelt strenuously objected to any attempt to introduce general revenue funding into the program. His famous quote on the importance of the payroll taxes was: *"We put those payroll contributions there so as to give the contributors a legal, moral, and political right to collect their pensions and unemployment benefits. With those taxes in there, no damn politician can ever scrap my social security program."* [2]

http://www.ssa.gov/history/court.html
Retrieved June 18, 2015 12:58 am

5.   Amazing oratory from Roosevelt about the need to tie benefits to wages notwithstanding, this Act, like most of his struck-down *New Deal*, is unconstitutional.

6.   Undeterred by the Constitution, Roosevelt figured out a way to make the Act repeal-proof:

2

**A President Tries to Pack a Court-**

In early 1937 President Roosevelt made what turned out to be the biggest political blunder of his career, and yet it was a blunder that would have fortuitous, even pivotal, importance for the fate of Social Security.

Federal judges are appointed for life. The Supreme Court of the 1930s was the most elderly in the history of the Republic, with an average age of over 71. President Roosevelt would derisively refer to them as "those nine old men." Actually, he only had four of them in mind. The Court was split down the middle in political terms. On the liberal side were three justices sympathetic to the New Deal programs (Brandeis, Stone and Cardozo); on the conservative side were four justices who voted against everything the Congress and the Administration tried to do (McReynolds, Butler, Van Devanter and Sutherland). In the middle were Chief Justice Charles Evans Hughes and Justice Owen Roberts, who were often "swing votes" on many issues. In the spring of 1935 Justice Roberts joined with the conservatives to invalidate the Railroad Retirement Act. In May, the Court threw out a centerpiece of the New Deal, the National Industrial Recovery Act. In January 1936 a passionately split Court ruled the Agricultural Adjustment Act unconstitutional. In another case from 1936 the Court ruled New York state's minimum wage law unconstitutional. The upshot was that major social and political reforms, including social insurance programs, appeared headed for defeat. This despite the obvious will of the electorate who returned Roosevelt to office in 1936 with the largest landslide in history.

7.   So we have, *in the government's own words,* the sordid legislative history of the Social Security Act of 1937, whereby tying benefits to earnings placated the power-tripping conservatives who cannot stand the idea that a poor person might be able to exist under something other than the threat of poverty, homelessness, starvation, and preventable death inherent in unbridled capitalism.

8.   Not sufficient to trust the judiciary, and in a manner which would make the authors of the PATRIOT ACT blush, Roosevelt then issued a veiled threat to involuntarily retire the judicial nuisance that was the SCOTS monopoly, one generally credited with allowing the Act to survive.

President Roosevelt's response to all of this was stunning and unexpected. On February 5, 1937 he sent a special message to Congress proposing legislation granting the President new powers to add additional judges to all federal courts whenever there were sitting judges age 70 or older who refused to retire. Couching his argument as a reform to help relieve the workload burden on the courts, President Roosevelt's unusually blunt language made it clear what he really had in mind: *"A part of the problem of obtaining a sufficient number of judges to dispose of cases is the capacity of the judges themselves. This brings forward the question of aged or infirm judges--a subject of delicacy and yet one which requires frank discussion. In exceptional cases, of course, judges, like other men, retain to an advanced age full mental and physical vigor. Those not so fortunate are often unable to perceive their own infirmities. . . A lower mental or physical vigor leads men to avoid an examination of complicated and changed conditions. Little by little, new facts become blurred through old glasses fitted, as it were, for the needs of another generation; older men, assuming that the scene is the same as it was in the past, cease to explore or inquire into the present or the future."* [3]

The practical effect of this proposal was that the President would get to appoint six new Justices to the Supreme Court (and 44 judges to lower federal courts) thus instantly tipping the political balance on the Court dramatically in his favor. The debate on this

## Anti-Discrimination Laws And The SSA

9.  Having just gotten around to canonizing the Miranda warning, and clarifying the language of the Second Amendment, and on a planet where the can *opener* was invented a full half-century after the tin can, justices has been delayed and denied to the collateral damage endured by Plaintiff, and those similarly situated.



**Patricia Arquette's Oscar speech on wage equality just won ALL the awards**

Piper Weiss / February 22, 2015 7:46 pm

Patricia Arquette just picked up a Best Supporting Actress Oscar and then absolutely took our breath away with her powerful speech about wage equality for women. Throughout this awards season, she's made some important statements about single motherhood and the importance of

"It's our time to have wage equality once an for all and equal right for women in the Unite States of America."
- Patricia Arquette

standing up for underrepresented women's issues. But tonight was the culmination of all her efforts, a moment that will absolutely go down in AWESOME Oscar history.

"To every woman who gave birth to every taxpayer and citizen of this nation: we have fought for everybody else's equal rights. It's *our* time to have wage equality once and for all and equal rights for women in the United States of America." she exclaimed, rallying the audience with her passion and straight-up eloquence about an issue that deserves to be recognized on such a public platform.

10.    Plaintiff avers, based on watching video the *2015 Academy Awards* and reading it on the internet, that women earn less money than men in their lifetimes.  Not surprisingly, the average retirement benefit is *$300.00+ greater for men than for women*.

11.    The government, as a matter of public policy, uses presumed discrimination as the constitutional basis for affirmative action, equal pay, and other statutes.

12.    Whistleblowers like Plaintiff earn less money in their lifetimes than those who *don't snitch*.

13.    (Whistleblowers  + anti-poverty)  >  any other compelling public interest.

14.    Whistleblowers  >  Jerry Sandusky and his $59,000+ pension from the Commonwealth.

5

2f228d5ffd7fafee

## The As-Applied Challenge (General)

15.    Plaintiff is *not* appealing the findings of the SSA, as this lawsuit is beyond that scope.  He is challenging the constitutionality of the benefits-calculation provision of the SSA, and of private pensions ensured by the PBGC.

16.    To quote what Arquette would have said, had her speechwriters thought of it: *why is the government punishing elderly women a second time for discrimination?*

17.    Even without civil rights legislation clearly creating a circumstance whereby targets of discrimination are punished under color of law with a reduced retirement (or disability) check, the retirement-benefits calculation violates the Equal Protection provision of the Fourteenth Amendment, with no possible compelling interest offsetting elderly poverty, employment discrimination, or whistleblower-silencing, assuming that was even the consequence of the least restrictive means.

## COUNT ONE:
## TITLE VII AND EQUAL-PROTECTION VIOLATIONS (BOTH DEFENDANTS, GENERAL)

18.    Plaintiff incorporates by reference, as if fully set forth verbatim herein, the entire contents of all previous paragraphs.

19.    Plaintiff's lifetime earnings have been reduced by at least one act of provable discrimination. Indeed, he just sued Kelly Services (*"The Kelly GIRL People"*) and Independence Blue Cross ("IBX") under the Rehabilitation Act, for not taking Plaintiff seriously when he said he wishes to work.  Should the need to prove more exist, if this Court asks via leave to amend, Plaintiff shall give plenty more on amendment.  Given the real retaliation risks of doing so, Plaintiff hopes this Court will simply stipulate that he is a targeted class.

20.    Because SSA and private pensions (for which Plaintiff is less likely to qualify due to discrimination), tie retirement (and disability) benefits to wages, they have run afoul of Title VII of the Civil Rights Act of 1964, the Equal Pay Act of 1991, the Rehabilitation Act of 1973, and The Americans With Disabilities Act of 1990, among other statutes, as well as the Equal Protection Clause.

6

21.   Like Bill Clinton's portrayer said during an SNL skit about his not meeting Megan Fox, who was in the studio at the time: *that's just __wrong__!* It's also been illegal since no later than 1963, which is why Plaintiff states this claim for relief on this basis.

22.   Absent discrimination, Plaintiff's monthly SSDI check would approach *two thousand dollars a month*. The same is true for the more sympathetically situated women, minorities, other disabled, felons, and others not named Jerry Sandusky.

23.   While Plaintiff is entitled to an SSDI check based on his *imputed income* (the one that would have been used to determine his child support payments) of almost "two dimes a month," he concedes the compelling interest in preserving the system while allowing time for it to phase out its illegal parts. To this extent, Plaintiff concedes a compelling interest except to the extent that his monthly benefit is beneath the federal poverty level of $11,770.00 in annual income for 2015, or $980.83 a month, to which he asserts entitlement based the dual public interests of anti-poverty and anti-discrimination.

24.   Plaintiff is entitled to injunctive relief sufficient to terminate the current benefits-calculation formula, replacing it with one which a) is not tied at all to wages, and b) in transition, which does not keep even one benefit recipient in poverty while Jerry Sandusky is collecting his $59,000 a year.  He is further entitled to c) his tax *dollar* not being used to fund equally unconstitutional pensions via PBGC.

25.   Plaintiff is proposing that a new, legal system be phased in by the year 2070, so that anyone currently in the workforce now retains the option of the current system, while the government offers buyouts to speed up the process.

## COUNT TWO:
## ADA/REHABILITATION AND EQUAL-PROTECTION VIOLATIONS (SSA, DISABILITY)

26.   Plaintiff incorporates by reference, as if fully set forth verbatim herein, the entire contents of all previous paragraphs.

7

27.    Under the current SSA benefit-calculation formula, Plaintiff could not have been determined to be disabled prior to 2011, not because he was not disabled, but because he was earning too much to qualify for benefits.

28.    Plaintiff has been disabled since his suicide attempt on Sunday, July 8, 1984 at or around 4:20 p.m.  He has bipolar disorder.

29.    Plaintiff has been discriminated against and otherwise had his income reduced due to disability, due to increasing stigmatization, ever since his diagnosis.  Examples of how Plaintiff is perceived include his being called names, in public, without shame from the speaker, like *a\*\*hole, overbearing, psychotic, sociopathic, bitter, whining, crazy, Fr00Tl00P* (on USENET), *batsh\*t crazy*, and *unemployable*, the final one told to this very Court in 2003, by the University of Pennsylvania (who employees thousands of secretaries), with Judge Anita Brody agreeing, saying "[Plaintiff's] employability has always been in question," when she ordered the Rule 35 examination in the course of Plaintiff's Title VII lawsuit.

30.    Simply put, no one likes Plaintiff and no one will hire him, despite his many skills, due to his attitude and mental illness.  It merely took until 2011 for his many skills to no longer allow him to fall over the "cash cliff" of the SSA's income limit.

31.    Unlike workman's compensation, SSDI does not provide a *reduced earnings benefit*, even in an extreme case like Plaintiff's.

32.    Plaintiff's current lawsuit against *The Kelly GIRL People*  and IBX stems from an incident in February, 1994, by which both Defendants terminated Plaintiff, explicitly citing his (alleged) "disorientation" as the grounds for termination.

33.    Plaintiff was punished a second time for this incident by Defendant SSA, because he did *not* take the other defendants at face value, did *not* take the easy way out, and did not apply for SSDI.  He had no reason to: he could still find work, albeit at the reduced rates of $7.50-9.00 an hour, thus greatly

8

reducing his benefit check.  Plaintiff was at his peak income from 1987-1993, and had lost four years of work credits (1983-1986) due to having been employed in the family business, literally against his will. Indeed, had Plaintiff waited but a year longer, he would be on SSI, and not even allowed to accumulate wealth without sacrificing his benefits.  Though he lacks standing, Plaintiff avers that SSI should be abolished and replaced with universal SSDI, imputing at least *minimum wage.*

34.    If this Court truly believes that Plaintiff would ever have blown a single whistle, thus exacerbating his limited options for employment, had he known he would wind up with an "early-retirement" check of $867.00 a month instead of a lifetime SSDI check which would now approach "two dimes," it is mistaken.  Is there not a public interest in encouraging whistleblowers?  Because stigma is what makes Plaintiff unemployable due to disability, he refers to his benefit as *whisability*.

35.    Plaintiff avers that the only three constitutionally sound classifications for workers are *employed, retired*, and *disabled*, except where a worker has consciously refused offers of employment. "Disability" is a matter of time when one lacks housing, food, and proper medical care, with delays costing not just lives, but a lot of money that would not be necessary were everyone's benefit check at parity with poverty.

36.    Because starvation and suicide are not options, Plaintiff further avers that *poverty itself* a breach of the social contract, simply due to the increased secondary costs to society when its inevitable effects kick in, without the economically mitigating factors of death and starvation to reduce costs. Theft, of course, is illegal, which leaves this lawsuit as the only real option, save for an act of maturity by Congress, for which Plaintiff is not holding his breath.  This is not "legislating from the bench," but rather the judiciary's proper role of *judging* legislation from the bench, something the fearful 1937 court could not do, as per the government's own words.

37.    Plaintiff's constitutional harm and damages are simple: the inability to travel, in this case to rebuild his life in privacy, secondary to his having been *cyberstalked* for close to twenty straight years,

9

including defamatory allegations that he is a pedophile, more imputations of mental illness, and the publication of his address and likeness to incite offline harassment. Regarding 36) above, Plaintiff is not suicidal, for if he were, he would be challenging to apply Oregon's assisted-suicide statute nationally, under equal protection grounds. He asks only that the government stop breaking the law so that his benefits allow him the proper exercise of his citizenship.

38.    Plaintiff is entitled to an order enjoining the SSA from calculating retirement and disability benefits in a manner which runs afoul of the constitution. Specifically, he is entitled to an order requiring the SSA to change its benefit formula for *all* Americans, to where disability is determined solely by medical capability, and income is imputed for those months or years where the disability resulted in reduced income, in this case from $22,000.00+ (in 1993) to $9,000.00+ (since).

39.    Plaintiff seeks no "earthquake" that would double his benefit check, but asserts that he is entitled to $980.83 per month, sufficient to keep him at parity with the poverty level, and that this benefit *not* include any deductions for Medicare.

40.    Plaintiff is also entitled to *not* enroll in Medicare until he is sixty-five, or takes full retirement at seventy, should he live that long (see below).

41.    Plaintiff further asserts an equal-protection violation, on the basis of his SSDI check automatically converting to a retirement check at age sixty-five, rather than allowing Plaintiff to gain the much-needed benefit that comes with retiring at seventy.

## COUNT ONE:
## EQUAL-PROTECTION VIOLATIONS (GEOGRAPHY)

42.    Plaintiff incorporates by reference, as if fully set forth verbatim herein, the entire contents of all previous paragraphs.

10

### Three Retirees Walk Into A Bar In Florida:
### One from New York City, Iowa, And Kansas

43.   The retiree from New York is the only one who can afford to drink there, because his check was inflated by his geographically inflated income, in clear violation of the Fourteenth Amendment. Plaintiff states this claim for relief on this basis.

44.   Plaintiff is entitled to have his income imputed based on his having worked in New York City his entire life, as a person not disabled.

45.   Plaintiff is entitled to injunctive relief sufficient to terminate the actionable conduct.

### PRAYER FOR RELIEF

Plaintiff prays to this Court for the following relief:

1.   An increase in his monthly SSDI benefit to *at least* the poverty level, but also to his imputed-income level, as determined by this court.

2.   An order enjoining the PBGC from insuring privately funded pensions.

3.   That his tax *dollar* no longer be used to punish targets of discrimination in disability and retirement, via a court order to the SSA and PBGC to devise a constitutionally sound benefits-calculation formula.

4.   A declaration that Plaintiff has been disabled for his entire working life, via overwhelming preponderance of the evidence, and the *person-not-living-under-a-rock* standard.

5.   An order requiring the SSA to calculate disability based on medical, not financial, considerations, and to design a system similar to the reduced-earnings benefit for workman's compensation, for both its SSDI benefits, and retirement work-credit formula.

6.   Anything less would be uncivilized, in violation of the social contract, and so prohibitively expensive that the entire system is projected to collapse within two decades if not changed.  Plaintiff is here not to change the system, but to have an illegal system shut down.

**JURY TRIAL DEMANDED**

Plaintiff exercises his right to trial by a jury of his fellow established pillars of the community.

This the 19th day of June, 2015

Gordon Roy Parker, Pro Se
4247 Locust Street, #119
Philadelphia, PA 19104
(267) 298-1257
SnodgrassPublish@aol.com
**PLAINTIFF**